**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

BLOCK CLUB CHICAGO,

      Plaintiff,

      v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

      Defendants.

Case No. 25-cv-1335 (TSC)

---

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    INTRODUCTION.............................................................................................1

II.   BACKGROUND .............................................................................................2

III.  LEGAL STANDARD ......................................................................................5

IV.  ARGUMENT ...................................................................................................5

    A.  Defendants bear the burden to show that any privacy interests in the photos outweigh the public interest in disclosure.....................................5

    B.  FOIA's foreseeable harm requirement augments the agency's burden ......................6

    C.  The privacy interests here are mitigated by the specific circumstances.......................7

    D.  The public interests are substantial ......................................................9

        1.  The requested information is necessary to evaluate ICE's public assertions of how it is performing its statutory duties.................................9

        2.  The requested information is necessary to investigate and report on particular incidents ...............................................................12

    E.  The public interests outweigh the privacy interests....................................13

V.    CONCLUSION ...............................................................................................14

<u>**TABLE OF AUTHORITIES**</u>

*Page*

**Cases**

*Am. C.L. Union v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) ....................................................10

*Campbell v. DOJ*, 164 F.3d 20 (D.C. Cir. 1998) ......................................................5, 14

*Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487 (1994) ....................................9, 12

*DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989) ..........................9

*Gannett Satellite Info. Network, LLC v. DOJ*, No. 22-cv-475, 2025 WL 416258 (D.D.C. Feb. 6, 2025) ........................................................................................................9

*Hall & Assocs. v. EPA*, 956 F.3d 621 (D.C. Cir. 2020)...................................................5

*Hum. Rts. Def. Ctr. v. United States Park Police*, 126 F.4th 708 (D.C. Cir. 2025)........8

*King v. DOJ*, 830 F.2d 210 (D.C. Cir. 1987)...................................................................5

*Leopold v. DOJ*, 94 F.4th 33 (D.C. Cir. 2024) ..........................................................6, 7

*Lepelletier v. F.D.I.C.*, 164 F.3d 37 (D.C. Cir. 1999)....................................................7

*Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157 (2004)....................................5

*Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021)...........5, 6

*Stern v. FBI*, 737 F.2d 84 (D.C. Cir. 1984)..................................................................12

**Statutes**

5 U.S.C. § 552(a)(4)(B) ...................................................................................................5

5 U.S.C. § 552(a)(8)(A)(i) ...............................................................................................8

5 U.S.C. § 552(b)(7)(C) ...............................................................................................5, 6

**Other Authorities**

Fed. R. Civ. P. 56(A) .......................................................................................................5

James Hill and Armando Garcia, Border Patrol commander admitted he lied about tear gas incident, judge says, as she restricts use of force by immigration agents in Chicago, *ABC News* (Nov. 7, 2025) ....................................................................................................................2

## I.    INTRODUCTION

President Trump has pledged to direct ICE to "carry out mass deportations – starting with the worst of the worst,"[1] a phrase used to refer to "criminal illegal aliens convicted of heinous crimes."[2]    The first ICE raids of his administration took place in Chicago days after his inauguration with the stated goal of deporting such individuals.

Plaintiff Block Club Chicago (a nonprofit news organization) sought information about the raids under the Freedom of Information Act.  After being ignored for months and forced to file suit, Plaintiff eventually obtained records regarding the arrests and detentions made during the raids.  ICE, however, redacted key information from those records that greatly diminishes their usefulness as a tool for promoting governmental transparency and for testing the government's claims about the focus of the raids.

ICE's stated justification for the redactions is a concern for the personal privacy of the people that it arrested and detained.  But those privacy interests are largely mitigated by the specific circumstances in this case.  ICE itself has selectively disclosed the information sought with respect to hundreds of people in circumstances materially identical to those here.  Further, the conventional assumptions about the desirability of public scrutiny are less likely to hold in the context of ICE detainees, who might well benefit from disclosure of their identities.

Under Exemption 7(C), courts must balance privacy considerations with the public interest in the information, which in this case is substantial.  U.S. Secretary of Homeland Security Kristi Noem, and DHS employees under her purview, have repeatedly made specific assertions about ICE's performance of its statutory duties that are difficult to reconcile with the data available, and

---

[1] https://www.dhs.gov/news/2025/12/08/dhs-unveils-wowdhsgov-new-searchable-website-lets-you-find-criminal-illegal-aliens
[2] https://www.dhs.gov/news/2025/12/30/ice-ends-2025-more-arrests-worst-worst-criminal-illegal-aliens-including-child

federal judges have found them to have lied about their activities.  *See, e.g.*, James Hill and Armando Garcia, Border Patrol commander admitted he lied about tear gas incident, judge says, as she restricts use of force by immigration agents in Chicago, *ABC News* (Nov. 7, 2025) (noting judge's finding in preliminary injunction hearing that "[Border Patrol Commander Greg] Bovino and the Department of Homeland Security claimed that he had been hit by a rock in the head before throwing the tear gas, but video evidence disproves this").  These assertions are central to one of the most contentious issues of our time, and as such, the public should be given all information necessary to evaluate them.  And the information redacted from ICE's spreadsheets is necessary for journalists and others to correlate the rows in that spreadsheet with known incidents so that the public can fully and accurately understand what specifically occurred in those incidents and know whether public officials are being honest about them.  For these and other reasons discussed below, the balance of considerations here tips in favor of disclosure.

## II.    BACKGROUND

In late January 2025, ICE began its first raids of the current presidential administration. Consistent with its messaging that it was "starting with the worst of the worst" violent criminals, it described these particular raids on its social media as "targeted operations" in Chicago for "keeping potentially dangerous criminal aliens out of our communities."[3]

On January 30, 2025, Plaintiff made a FOIA request to ICE for its records concerning the arrests and detentions made during the raids.  *See* ECF No. 16-1 ("D. SOF"), ¶ 1.  Over the next three months, Plaintiff sent numerous follow-up messages to ICE in an attempt to get a response, all of which were ignored.  *See* Compl., ¶¶ 13–23.  On May 1, 2025, Plaintiff brought this suit to compel a response to its request.

---

[3] https://x.com/ICEgov/status/1883577941210062880.

Two months after this suit was filed, ICE produced two spreadsheets to Plaintiff.  D. SOF ¶ 4.  Three months after that, ICE removed some of the redactions.  *Id.* ¶ 5.  The revised records, however, still redact detainee names and ages, numeric case numbers, and, apparently, arrest location.  The parties' summary judgment motions concern the propriety of those redactions.

In the year following the raids, ICE has continued to assert that its operations have "focused on the worst of the worst"[4] and "relentlessly targeted" violent criminals.[5]  In support of that narrative, ICE has selectively disclosed personal information of detainees like that sought here in Plaintiff's FOIA request.  For example, on both its governmental website and social media, ICE has published the name, age, residency, detention photograph, and description of hundreds of people it has detained.  *See* https://web.archive.org/web/20250926211818/https://www.ice.gov/wow/.  ICE urges citizens to "[c]heck out" its arrests "to get a closer look at the criminal aliens we've recently taken into custody."  *Id.*  Among these are individuals with "pending charges" (i.e., have not actually been found guilty), such as the following:

---

[4] https://www.fox13news.com/news/homeland-security-secretary-kristi-noem-gives-ice-operations-update-sarasota

[5] https://www.dhs.gov/news/2025/12/30/ice-ends-2025-more-arrests-worst-worst-criminal-illegal-aliens-including-child



**Bassiru Seck**

ICE Atlanta arrested Bassiru Seck, a 50-year-old criminal
alien from Gambia, on Sept. 21. He has pending charges
for carrying a concealed weapon, second-degree
trespassing and possession of drug paraphernalia in
Wake County, North Carolina.

**Share**



As shown here, ICE invites members of the public to "Share" on their social media the name, age, city, and arrest date of these individuals.

Also in the year following the raids, Plaintiff and other news organizations have been trying relentlessly to get records from ICE that would allow public assessment of its conduct. What little data ICE has disclosed, however, has raised serious questions about the truth of ICE's public assertions of how it is performing its statutory duties. ICE has categorically asserted that "no American citizens have been arrested or detained,"[6] which again is of dubious veracity.[7] Although in broad strokes these assertions are suspect, the specifics are still elusive due to ICE's refusal to release information like that at issue here. For example, without their names, the existence and nature of detainee crimes cannot be evaluated. Further, the redaction of names and arrest locations undermines the ability to link known incidents and individuals with the provided data, preventing journalists from reporting on the actual nature of those incidents. The question now before the

---

[6] https://docs.house.gov/meetings/JU/JU10/20251119/118665/HHRG-119-JU10-20251119-SD006-U6.pdf

[7] https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will

Court is whether privacy concerns here are substantial enough to preclude the public from learning the answers to such questions.

### III.     LEGAL STANDARD

In FOIA cases, like all others, "[s]ummary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hall & Assocs. v. EPA*, 956 F.3d 621, 629 (D.C. Cir. 2020) (quoting Fed. R. Civ. P. 56(A)). An agency asserting a FOIA exemption bears the burden to show it applies. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021). It may meet that burden through declarations and *Vaughn* indices, but only those that "specifically identify[] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of a withheld document to which they apply." *King v. DOJ*, 830 F.2d 210, 224 (D.C. Cir. 1987). The Court reviews the agency's determinations *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

### IV.     ARGUMENT

**A.     Defendants bear the burden to show that any privacy interests in the photos outweigh the public interest in disclosure.**

FOIA Exemption 7(C) applies when disclosing a record "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[8] Whether an invasion of privacy is "unwarranted" hinges on the balance between the privacy interests implicated by the records and the public interest in disclosure. *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004). Thus, the existence of privacy interests—even "important privacy rights"—is insufficient to withhold a record if the public interest exceeds them. *Campbell*

---

[8] Although the records were withheld under both Exemptions 6 and 7(C), Plaintiff does not dispute that the records satisfy Exemption 7's threshold requirement of being compiled for law enforcement purposes, and therefore that Exemption 7(C) is the appropriate framework to apply here. *See* D. MSJ at 5–6.

*v. DOJ*, 164 F.3d 20, 33 (D.C. Cir. 1998).  Further, given the "presumption of openness inherent in FOIA," the agency performing the balance must make more than "an abstract attempt to identify possible public interests in disclosure," and the resulting balance must be more than an "empty formality."  *Id.*

### B.    FOIA's foreseeable harm requirement augments the agency's burden.

On top of establishing an exemption, the agency must also show that disclosure "would foreseeably harm an interest protected by the exemption."  *Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024).  This requirement applies to records withheld under "all exemptions, except Exemption 3," *id.*, and therefore is applicable here to withholdings under Exemption 7(C).  To satisfy this burden, the agency must show how disclosure "would," not "could," harm an interest protected by the exemption.  *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369–70 (D.C. Cir. 2021).  It must make that showing with a "focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually" harm an interest protected by the exemption.  *Id.* at 370.

Though Exemption 7(C) contains a built-in harm analysis, the foreseeable harm requirement augments the burden an agency must meet.  As noted earlier, Exemption 7(C) applies if disclosure "***could reasonably be expected to*** constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (emphasis added).  But as *Reporters Committee* teaches, "could" is not good enough for foreseeable harm: the agency must show that disclosure "would" cause harm.  *Reps. Comm.*, 3 F.4th at 369–70.  And since Exemption 7(C) aims to protect against "unwarranted invasion[s] of personal privacy," 5 U.S.C. § 552(b)(7)(C), the foreseeable harm provision requires an agency to show that such harm "would" result, not merely that it could reasonably be expected to.

- 6 -

### C.    The privacy interests here are mitigated by the specific circumstances.

Defendants contend that "individuals have a substantial privacy interest in their personally identifiable information in law enforcement files." D. MSJ at 7. While detainees in general have such non-*de minimis* privacy interest, this case presents special circumstances that mitigate them.

The conventional assumption that people would not want their name disclosed in connection with an arrest is more tenuous in this context. That is because many of the individuals who were swept up in the raids may very well welcome public scrutiny of their detention. Such attention from journalists and others has led to a variety of positive outcomes such as reuniting families,[9] better detention conditions,[10] and congressional investigations.[11] At the very least, it cannot be categorically assumed that the individuals at issue here would prefer to have their names kept secret at the expense of public scrutiny of their situation. Where individuals have an "interest in the disclosure of their names," it "is overly paternalistic to insist upon protecting an individual's privacy interest when there is good reason to believe that he or she would rather have both the publicity and the [benefit] than have neither." *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 48 (D.C. Cir. 1999).

Defendants contend that disclosure here "could cause harm to the individual, expose the individual to identity theft, and may lead to unwanted contact from persons that might seek to harm the individual." D. MSJ at 8. As a preliminary matter, that something theoretically "could" occur is insufficient to meet Defendants' burden for the reasons explained in the previous section. *See supra*, § IV.B; *Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024) ("Significantly, in 2016 Congress

---

[9] https://www.americanimmigrationcouncil.org/report-page/press-highlighted-harms-family-separation/
[10] https://www.icij.org/investigations/solitary-voices/
[11] https://www.propublica.org/article/immigration-agents-detained-mistreated-citizens-congressional-investigation

enacted the FOIA Improvement Act . . . which further limited withholding pursuant to all exemptions, except Exemption 3.  Under this limit, the agency bears the burden of showing that it 'reasonably foresees that disclosure **would** harm an interest protected by an exemption' or that 'disclosure is prohibited by law.' 5 U.S.C. § 552(a)(8)(A)(i).") (emphasis added).

Further, simply alluding to some unspecified "harm" is too vague to address, and there is no evidence of people being harassed simply by virtue of having been previously detained by ICE. Regarding potential "identity theft," ICE cites no evidence that the disclosure of an individual's name itself meaningfully increases that risk—one cannot effectively impersonate someone else simply by knowing their name.  Thus, if identity theft is truly the concern here, it is not a basis to withhold detainee names.  Nor is a detainee's age especially sensitive from an identity theft perspective.  Although Defendants refer to "birth dates" in its brief, D. MSJ at 7, Plaintiff's requests only seek "age," and thus the birth month and day is properly redacted (and ICE's data already includes unredacted birth years, so this point is moot).  Finally, "address of action" and "case number" are also not the types of sensitive information that would allow one's identity to be effectively misappropriated, and Defendants' contrary speculation is insufficient at summary judgment.  *See Hum. Rts. Def. Ctr. v. United States Park Police*, 126 F.4th 708, 716 (D.C. Cir. 2025) (holding that agency may not establish a substantial privacy abstract through "speculative or abstract fears").  Nor is there any reason to think that these ICE detainees would be an especially sought-after target for identity thieves.

Finally, ICE's professed privacy concerns are dubious given the agency's conduct outside of this case.  As discussed above in the Background section, ICE has had no personal-privacy qualms with publishing the full name, age, residency, and detention photograph of hundreds of people—including those who have not actually been convicted of the charges alleged.  Indeed,

ICE not only publishes that information but urges members of the public to "Share" it on their social media. *See supra*, § II. If a federal agency truly foresaw the harms it now posits, it would presumably not engage in such behavior. *See Gannett Satellite Info. Network, LLC v. DOJ*, No. 22-cv-475, 2025 WL 416258, at *14 (D.D.C. Feb. 6, 2025) (holding that government is "expected" to protect individuals' privacy interests). In sum, detainees' privacy interests are weak in the particular circumstances of this case.

> ### D.    The public interests are substantial.

The public interest pertinent to FOIA's privacy balance is to "shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 497 (1994) (internal quotation marks and alterations omitted) (quoting *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)). In its brief, ICE argues that it is "unclear" how the information sought "will reveal anything about ICE's conduct." D. MSJ at 7. It is not unclear at all—this information will enable evaluation of both ICE's public assertions of how it is performing its statutory duties as well as the actual conduct that has occurred. These public interests are addressed in turn.

> ### 1.    The requested information is necessary to evaluate ICE's public assertions of how it is performing its statutory duties.

In both its press events and social media, ICE has repeatedly asserted it is focusing its resources on apprehending violent criminals and does not arrest U.S. citizens. Such conduct is plainly related to the "agency's performance of its statutory duties" and "what [the] government is up to." *Fed. Lab. Rels. Auth.*, 510 U.S. at 497.

There is good reason to evaluate the veracity of such assertions. With respect to citizen detentions, Secretary Noem recently stated that "no American citizens have been arrested or

detained."[12]  DHS similarly released public statement on October 1, 2025 asserting: "We have said it a million times: ICE does NOT arrest or deport U.S. citizens."[13]  Such assertions appear to be false—journalists have uncovered more than 170 such incidents in the first nine months of the current administration.[14]  But how false is still unclear, as is the basis and circumstances for any such arrests or detentions.  Although ICE is presumably of the view that none of the individuals swept up in these particular raids were U.S. citizens, its citizenship determinations have been wrong before.[15]  And though the redactions themselves would not directly reveal citizenship status, they will enable the public to do so indirectly, such as by searching public voting records or conducting interviews.  *See Am. C.L. Union v. DOJ*, 655 F.3d 1, 13 (D.C. Cir. 2011) (holding that the FOIA public interest includes those realized through "derivative uses" of the records).

Likewise, with respect to a purported focus on violent criminals, Kristi Noem has asserted that ICE is "focused on the worst of the worst."[16]  DHS press releases state that ICE will "carry out mass deportations – starting with the worst of the worst"[17] and has "relentlessly targeted" the "worst of the worst criminal illegal aliens convicted of heinous crimes."[18]  Further, the existence

---

[12] https://docs.house.gov/meetings/JU/JU10/20251119/118665/HHRG-119-JU10-20251119-SD006-U6.pdf

[13] https://www.dhs.gov/news/2025/10/01/dhs-debunks-new-york-times-false-reporting-dhs-does-not-deport-us-citizens

[14] https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will

[15] *See, e.g.*, https://www.nbcwashington.com/news/local/maryland-mother-who-says-shes-a-u-s-citizen-is-released-from-25-days-in-ice-custody/4039780/

[16] https://www.fox13news.com/news/homeland-security-secretary-kristi-noem-gives-ice-operations-update-sarasota

[17] https://www.dhs.gov/news/2025/12/08/dhs-unveils-wowdhsgov-new-searchable-website-lets-you-find-criminal-illegal-aliens

[18] https://www.dhs.gov/news/2025/12/30/ice-ends-2025-more-arrests-worst-worst-criminal-illegal-aliens-including-child

of a criminal record is only part of the story—ICE's narrative is that it is targeting "dangerous" and "violent" criminals, which requires analysis of the underlying crimes to assess.

The particular Chicago raids at issue here are especially probative of whether ICE is in fact "starting with" violent criminals, as they were the first raids of the current presidential administration.  Indeed, ICE at the time described these specific raids as "targeted operations" for "keeping potentially dangerous criminal aliens out of our communities."[19]  There is an important public interest—especially for members of the affected community—in determining the extent to which these particular ICE raids in Chicago did in fact keep the community safe of dangerous criminals as ICE has represented.

The information sought in this FOIA request is necessary to meaningfully assess issues like those addressed above.   Without names, the citizenship and criminal history of individuals cannot be ascertained.  And to actually assess whether these particular individuals have committed or been accused of "violent" crimes or are a "danger" to the community as ICE has represented is the case, it is necessary to evaluate the nature and severity of the charges, which again requires identifying information.

Accurate data is especially necessary here in light of ICE's selective disclosure.   As discussed above in the Background section, ICE has happily disclosed the full name, age, residency, and detention photograph of hundreds of people it has detained in order to emphasize their position that it is focused on the "worst of the worst" "criminal aliens" who have been "accused of heinous crimes that put the American public at risk."  *See supra*, § II.

Finally, the records will serve the public interest whether ICE's assertions are true or false.  ICE is currently operating in the shadow of considerable public distrust, with approximately half

---

[19] https://x.com/ICEgov/status/1883577941210062880.

of Americans believing that ICE is wrongfully arresting U.S. citizens and is not targeting criminals.[20]  To the extent the data allows independent confirmation of ICE's characterizations, that would also serve the public interest and facilitate informed public debate.  Put differently, the whole point of FOIA is to get at the truth, whatever that truth happens to be, instead of Americans being required to guess whether the government's descriptions of the world are accurate:  "One basic general assumption of the FOIA is that, in many important public matters, it is for the public to know and then to judge."  *Stern v. FBI*, 737 F.2d 84, 94 (D.C. Cir. 1984).

### 2. The requested information is necessary to investigate and report on particular incidents.

In addition to aggregate statistics like those discussed above, there is also a public interest in reporting on ICE detainees' experiences and particular ICE operations.  ICE does not possess unlimited authority to do whatever it wants with people it detains—it is subject to various legal constraints such as limits to how long it can hold people in particular situations as well as protections against cruel and unusual punishment.  Assessing the extent to which ICE is complying with the law relates directly to the "agency's performance of its statutory duties" and is a strong public interest.  *Fed. Lab. Rels. Auth.*, 510 U.S. at 497.

First, journalists need to know whom to contact to interview.  Although in some cases relevant individuals can be identified through investigation, in most cases they cannot.  Further, ICE detainees are overwhelmingly low-income individuals who often lack the resources or wherewithal to seek out reporters on their own to have their stories investigated and told.  Dumke Decl., ¶ 9.

Second, ascertaining how detainees move through the system, including how long and where they are kept, is hindered by ICE's redaction of identifying information, because ICE will

---

[20] https://www.miamiherald.com/news/nation-world/national/article312414392.html

not speak to journalists about specific detainees unless the journalist identifies them first. *Id.*, ¶ 10. Further, even where the name of an individual or arrest location is known, it cannot be linked to the specific rows in ICE's spreadsheets of aggregate data because ICE redacts that information. *Id.*, ¶ 11.

These are not theoretical concerns—journalists' reporting on ICE operations has been consistently stymied by such redactions. For example, one technique ICE had deployed in Chicago is to lure immigrants under the guise of a pre-arranged "check-in" interview, but then instead of doing that, simply detaining them. Although information about such operations has leaked out to some degree,[21] journalists are still trying to find out exactly how many people have been detained in such sting operations, as well as what happened to them afterward, which requires arrest locations and personally identifying information. Dumke Decl., ¶ 13. As another example, ICE raids in Chicago have targeted entire apartment building complexes on the theory that they are a hotbed of gang activity.[22] But in many cases, no criminal charges are ever filed, no gang activity is ever disclosed, and journalists attempting to investigate are thwarted because ICE redacts arrest locations as well as personally identifying information. Dumke Decl., ¶ 14. Examples like these are numerous, but the general point is that the information sought is necessary to fully and accurately report on ICE's operations and confirm that it is complying with its statutory obligations as it contends.

### E.    The public interests outweigh the privacy interests.

As discussed above, the privacy concerns associated with disclosure of the information sought is in large part mitigated by various considerations, whereas the public interest in evaluating

---

[21] *See, e.g.*, https://blockclubchicago.org/2025/06/04/ice-mass-arrest-sparks-chaos-in-south-loop-as-activists-fight-to-disrupt-operation/
[22] *See, e.g.*, https://blockclubchicago.org/2025/09/30/armed-agents-in-unmarked-vans-target-south-shore-apartment-building/

both ICE's public assertions of how it is performing its statutory duties as well as its actual conduct is substantial. On balance, the privacy balance tilts toward disclosure, and Exemption 7(C) is not satisfied.

Defendants have made no serious attempt to balance these interests. ICE's FOIA Director asserts in his declaration that, when evaluating Exemption 7(C), "ICE balances an individual's personal privacy interest against the public's interest in the disclosure of the information." Pineiro Decl., ¶ 21. Notably missing, however, is any actual consideration of how disclosure of the information at issue might benefit the public. Instead, the declaration merely asserts without explanation that the information "serves no public benefit." *Id.*, ¶ 24. In short, Defendants have made no more than "an abstract attempt to identify possible public interests in disclosure," and that their balancing of the interests is nothing more than an "empty formality." *Campbell v. DOJ*, 164 F.3d 20, 33 (D.C. Cir. 1998).

## V.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiff, deny summary judgment to Defendants, and order Defendants to release unredacted versions of the produced spreadsheets.

Dated: January 21, 2026                    Respectfully submitted,

                                           */s/ Stephen Stich Match*
                                           Matthew Topic, D.C. Bar No. IL0037
                                           Stephen Stich Match, D.C. Bar No. MA0044
                                           Merrick Wayne, D.C. Bar No. IL0058
                                           LOEVY & LOEVY
                                           311 N. Aberdeen, Third Floor
                                           Chicago, IL 60607
                                           Tel. (520) 488-0486
                                           match@loevy.com
                                           foia@loevy.com

                                           *Attorneys for Plaintiff*

- 14 -